(C. D. 1418)

BAILEY GREEN & ELGER, INC. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided May 20, 1952)

*Strauss & Hedges* (*Joseph Schwartz* and *Barnes, Richardson & Colburn* (by *Edward N. Glad*) of counsel) for the plaintiff.
*Charles J. Wagner*, Acting Assistant Attorney General (*Richard H. Welsh*, special attorney), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges

LAWRENCE, Judge: Plaintiff imported certain metal buttons which were classified by the collector of customs pursuant to the provisions

of paragraph 349 of the Tariff Act of 1930 (19 U. S. C. § 1001, par. 349) as "metal buttons embossed with a design, device, pattern, or lettering" and duty was assessed thereon at the rate of 45 per centum ad valorem.

It is claimed by plaintiff that these buttons are not embossed and that they should be classified as buttons of metal, not specially provided for, in accordance with said paragraph 349, as modified by the trade agreement between United States and the United Kingdom, 74 Treas. Dec. 253, T. D. 49753, effective January 1, 1939, and dutiable at the rate of one-half cent per line per gross plus 10 per centum ad valorem.

The items in dispute appear on the consular invoice as numbers 2405, 2406, and 2407 and are represented by samples received in evidence as exhibits 1, 2, and 3, respectively.

Two witnesses were called, both of whom appeared on behalf of plaintiff. Marcy Head testified that he was purchasing agent for Bailey Green & Elger, Inc., plaintiff herein, button importer and jobber, with whom he had been associated for 29 years. Through this witness, the exhibits referred to were identified and received in evidence.

The second witness, Richard Gibian, testified that he represented the Czechoslovak Button and Hardware Factories, now known as Koh-I-Noor, Ltd., and had obtained the order from plaintiff to purchase these buttons from the factory in Prague; that he had visited factories in Czechoslovakia and had seen buttons such as exhibits 1, 2, and 3 manufactured. In explaining the method of producing buttons like exhibits 1 and 2, Gibian testified as follows:

&ast; &ast; &ast; There are strips of metal, of yellowish looking metal, out of which round pieces are stamped out, according to the size of the button which is to be manufactured.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

That is the first operation, &ast; &ast; &ast;.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

Then those little round pieces are put under a die which by a short stroke impresses the respective pattern on the metal. That is the second step. Then, there is a third step. Those round metal pieces which show the patterns, are subjected to another die which forms a curvature of the button, according to the requirements of the respective firm, and at the same time, this die makes the holes where the pattern shows holes, where the holes are punched.

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

Then there is a fourth process. In these buttons which we call filigree buttons, the lower half of the button which shows this mirror effect is stamped out in a separate operation.

Q. Then how are these two pieces put together?—A. They are put on a little machine where they are stamped together. ·

This witness testified that exhibits 1 and 2 consist of two pieces whereas exhibit 3 consists of one piece, and that in the production

of buttons such as exhibit 3, the last two operations to which exhibits 1 and 2 were subjected are omitted.

The precise method of producing the buttons represented by exhibit 3 was given by the witness Gibian as follows: "Cutting out of the round piece of metal out of the metal strip, that is a solid circle; and the second operation is the impact of the die *which puts a pattern on that metal. It gives it a raised effect there.* And the next operation is a similar die, which adds this curve, either a round curve, and at the same time cuts out and smooths out the holes *which are in this pattern.*" [Emphasis added.] The witness was unable to recall how the eyelet was produced on the back of exhibit 3.

Furthermore, on re-cross-examination, the witness Gibian gave the following testimony:

R X Q. Now, Mr. Gibian, when the second operation was performed, you had a male and a female die, didn't you?—A. Yes.

R X Q. So that you had one die on the bottom and one die on the top?—A. Yes.

    *        *        *        *        *        *        *

R X Q. So that the round disk that you started with, Exhibit 1, after it was subjected to Exhibit 2, the male die, and the female die in conjunction force the metal up from the bottom into the pattern or design which was on the male die on top, isn't that correct?—A. It comes out, it shows this pattern.

R X Q. So that it was forced up, is that correct?—A. I think so.

The sole question for our determination is whether or not the buttons above described are embossed within the meaning of that term as used in paragraph 349, *supra*. In support of the contention that the buttons in controversy are not embossed, plaintiff relies on the following cases: *Stiner & Son and Bischoff & Co.* v. *United States*, 2 Ct. Cust. Appls. 347, T. D. 32079; *Absorbo Beer Pad Co., Inc.* v. *United States*, 30 C. C. P. A. (Customs) 24, C. A. D. 209; *United States* v. *Bailey, Green & Elger, Inc.*, 30 C. C. P. A. (Customs) 228, C. A. D. 237; and *Bailey, Green & Elger, Inc.* v. *United States*, 15 Cust. Ct. 224, Abstract 50326.

In the *Stiner* case, *supra*, it appears that the merchandise consisted of post cards ornamented by a printing in gold on a gelatin surface and impressed with an indented design producing an effect in relief, which the court held to be properly described by the language of paragraph 412 of the Tariff Act of 1909 as "either die cut or embossed." In arriving at the meaning of the words "embossed" and "embossing," the court referred to the exhibits before it in that case and said:

* * * These are all forms, figures, or designs, and as they are actually raised above the surface which immediately surrounds them and give the impression to the eye of standing out in relief we are of opinion that they are embossed within the accepted meaning of that term.

Further, the court observed:

* * * We agree with counsel for the importer that the mere impression on a card of an intaglio design or figure does not necessarily result in the embossing

of the surface surrounding it. Embossing implies not only a perceptibly raised surface but a raised surface which is distinctively and perceptibly a form, figure, or design. On the other hand, the surface of an embossed form, figure, or design *need not be raised above the general surface of the article. It is enough if it be raised above the surface which immediately surrounds it.* Neither does embossing necessarily require that the relief effect shall be directly produced by a die appropriate for the purpose. [Italics added.]

It will be recalled that Gibian testified herein that all of the buttons in controversy were subjected to what he referred to as a second process in which the round pieces of metal are "put under a die which by a short stroke impresses the representative pattern on the metal."

The *Absorbo* case, *supra*, concerned the question whether pinpricked pulpboard for making beer pads should be regarded as embossed pulpboard. In the course of its opinion, the court referred to the *Stiner* case, *supra*, and to *United States* v. *Meyerson*, 2 Ct. Cust. Appls. 225, T. D. 31953, in the following terms: "In the former case, the colored pictures and figures on the imported postcards had a particular design made by running the cards through a press and over a stamp or plate bearing a pattern or design in relief. In the *Meyerson* case the imitation grain leather cardboard had been passed between a smooth roller and an indented roller. There is no such showing in the instant case." It was the judgment of the court that the beer pads there in controversy were not embossed.

In *United States* v. *Bailey, Green & Elger, Inc., supra*, the court reviewed a judgment of the first division of this court (*Bailey, Green & Elger, Inc.* v. *United States*, 8 Cust. Ct. 511, Abstract 47149) wherein it was held that metal buttons used for buttoning women's coats and skirts were properly classified as "buttons embossed with a design, device, pattern, or lettering", as provided in paragraph 349 of the Tariff Act of 1930. It appears from the opinion of the trial court in that case that the "Government conceded that the merchandise consists of metal buttons embossed with a design, device, pattern, or lettering." Nevertheless, the appellate court took occasion in its opinion to quote various definitions of the word "emboss" as follows:

2. To raise the surface of into bosses or protuberances; particularly, to ornament with raised work.

3. To raise in relief from a surface, as an ornament, a head on a coin, or the like.

  .*   *   *   *   *   *   *

4. Hence, to adorn or embellish with rich ornamentation. (Webster's New International Dictionary.)

1. To cover, stud, or ornament with bosses, protuberances, or raised work; raise the surface of into bosses or ornaments in relief; hence, to decorate prominently or richly.

  *   *   *   *   :   *   *   *

2. To raise or represent in relief from or upon a surface, as in metal-work or embroidery, cause to stand out. (Funk & Wagnalls New Standard Dictionary.)

However, the ultimate question for determination in that case was whether metal buttons concededly embossed as above described were dutiable as such or whether they should be classified as dress buttons "designed to be worn on apparel or carried on or about or attached to the person." Legislative history and other circumstances impelled the court to the conclusion that the provision for metal buttons embossed with a design, device, pattern, or lettering was the more specific classification.

Another case in which this court had occasion to consider the meaning of the term "embossed" as applied to buttons is *Bailey, Green & Elger, Inc.* v. *United States*, 15 Cust. Ct. 224, Abstract 50326. In the opinion of the court, the process of manufacture of the buttons in that case was described as follows:

\* \* \* First, a metal blank or disk is made, or chopped out, then holes are punched in the disk according to size. Thereupon, little rivets, or "steel points" or "pegs" are placed in the holes and clipped off with cutting nippers, apparently almost flush with the reverse side, then hammered with a very fine hammer. Buffing off the rough parts completes the operation. Thus the back of the finished article is one piece, but every point on the front is a separate "rivet."

The following definition from the Encyclopaedia Britannica (14th ed., vol. 8, p. 386) was set forth in the opinion:

EMBOSSING, the art of producing raised portions or patterns on the surface of metal, leather, textile fabrics, cardboard, paper and similar substances. Strictly speaking, the term is applicable only to raised impressions produced by means of engraved dies or plates brought forcibly to bear on the material to be embossed, by various means, according to the nature of the substance acted on. *Thus raised patterns produced by carving, chiselling, casting and chasing or hammering are excluded from the range of embossed work.* Embossing supplies a *convenient and expeditious medium for producing elegant ornamental effects* \* \* \*. [Italics quoted.]

Reference was also made by the court to a pamphlet entitled "The Button Industry," Tariff Information Series No. 4, published by the United States Tariff Commission in 1918, in which appears the following definition of "embossed":

Heavy raised design *pressed on surface.* [Italics quoted.]

The rationale of the various cases we have discussed leads to the conclusion that embossing as popularly understood implies an adornment or ornamentation consisting of "raised work," "To raise or represent in relief from or upon a surface," "the art of producing raised portions or patterns on the surface of metal, leather, textile fabrics, cardboard, paper and similar substances." Further, as stated in the definition quoted herein from the Encyclopaedia Britannica,

"Strictly speaking, the term is applicable only to raised impressions produced by means of engraved dies or plates brought forcibly to bear on the material to be embossed, by various means, according to the nature of the substance acted on."

It is significant that the witness Gibian who was familiar with the processes of manufacturing the buttons in controversy, testified with respect to exhibits 1 and 2 that after circular pieces are cut from strips of metal they are "put under a *die* which by a short stroke *impresses the respective pattern on the metal*." [Emphasis added.]

With respect to exhibit 3, Gibian testified that after the round pieces had been cut out of the metal strip, the next operation "is the *impact of the die which puts a pattern on that metal. It gives it a raised effect there*." [Emphasis added.]

In our opinion, the testimony of the sole witness who testified regarding the fabrication of the buttons in controversy brings the buttons squarely within the meaning of the term "embossed" as it appears in paragraph 349, *supra*.

It is clear from an ocular inspection of the three exhibits (which becomes more definite when aided by the use of a glass) that in each instance the button has a pattern or figure or design raised above the general surface of the article.

In its brief, plaintiff argues that a "visual examination of these exhibits shows that the buttons do not have a surface other than the designs; that instead of a surface from which a design is raised, as on an embossed button, there is only space. In other words, the holes in these Exhibits 1, 2 and 3 make impossible any surface background which is so essential to the judicial definitions of 'emboss'."

With respect to exhibits 1 and 2, however, it should be borne in mind that in what is described as the second process in producing them, the circular metal pieces are "put under a die which by a short stroke impresses the respective pattern on the metal." At that period of time in the process of manufacture the patterns that had been impressed upon the metal by means of the die were clearly designs raised above the general surface of the article and it was by a subsequent process that, by means of another die, the holes were made "where the pattern shows holes, where the holes are punched" with the result that in the final analysis the buttons represented by exhibits 1 and 2 clearly show upon close examination that the designs are raised not only above the surrounding area but wholly or in part are raised above the surface immediately surrounding them, and this latter statement is equally true with respect to exhibit 3.

It is significant, as pointed out earlier in this opinion, that in performing what is referred to as the second operation which produces the pattern on the metal blanks in exhibits 1, 2, and 3 both male and female dies are employed.

In its brief, plaintiff argues that "the common meaning of 'emboss' requires a background surface which these buttons do not have." And then asserts that "In addition, to be a 'button, embossed' there must be a preexisting button, which has an existence as a button and is then embossed, which is not the case here."

However, in this connection, defendant invites our attention to the case of *Kayser & Co. (Inc.)* v. *United States*, 13 Ct. Cust. Appls. 474, T. D. 41367. In that case, it appears that embroidery was placed upon glove tranks before the tranks were fashioned into gloves, and it was there contended that the gloves could not be said to be embroidered because the embroidery was not placed upon the gloves but upon the fabric. The appellate court disposed of that contention as follows:

* * * That argument is sophistical and has no sound reason to support it. The work on the points was embroidery, when it was placed on the tranks, and it was no less embroidery after the tranks were converted into gloves. It is wholly immaterial whether embroidery is placed on an article before or after it is completed for the purpose of determining whether or not the article is "embroidered." It may be that an embroidered trank is not an embroidered glove, but it is certain that if the trank be converted into a glove, the embroidery on the back makes it an "embroidered glove."

Applying the reasoning of the *Kayser* case, *supra*, to the present controversy, it would seem a matter of no consequence whether the embossing took place before or after the buttons were completed in determining whether or not they are embossed.

In view of the foregoing circumstances and upon the record before us, we find and hold that the buttons in controversy were properly classified by the collector as "metal buttons embossed with a design, device, pattern, or lettering" pursuant to paragraph 349, *supra*, and overrule the protest in all respects.

Judgment will be entered accordingly.